**PEOPLES WATER AND GAS CO. v. GREEN, Comptroller.**
**No. 15011.**

Circuit Court, Leon County.

January 9, 1959.

R. D. Maxwell, Jr. and L. L. Robinson, both of Miami, for plaintiff.

Richard W. Erwin, Attorney General, and Fred M. Burns, Ass't. Attorney General, Tallahassee, for defendant.

HUGH M. TAYLOR, Circuit Judge.

By appropriate pleadings and agreement upon the pertinent facts the court is called upon to determine the liability of the plaintiff for sales or use taxes with respect to certain items of tangible personal property purchased by plaintiff and used by it in its business of manufacturing artificial gas for commercial use and sale.

In order to pass upon the contentions of the parties it is necessary to outline in a general way some phases of the manufacturing processes employed by the plaintiff and the use in connection therewith of the various types of property with respect to the purchase and use of which the defendant claims the plaintiff should be taxed.

It appears that early in the process of manufacturing gas plaintiff utilizes an apparatus by which brick of a special type known as *carbofrax or checker brick* are alternately heated to a high temperature and sprayed with crude oil so that the heat from the brick gasifies the oil. The apparatus is so designed that this process is repeated in four-minute cycles as a continuous operation. After about four months' use, the bricks break down and must be replaced. The gas, or more accurately, the combination of gases, thus produced is not suitable for commercial use until a number of undesirable substances are removed by processes, some of which are hereinafter described.

Among the objectionable substances in the gas as originally formed is sulphur, largely in the form of hydrogen sulphide. In order to remove this sulphur the gas is forced through chambers containing *iron oxide* and chips or shavings of inert materials. By chemical processes the hydrogen sulphide combines with the iron oxide to produce ferric sulphide and water, which are easily removed from the gas. The ferric sulphide produced by this process is of no further use to plaintiff in that form but may be reclaimed by the following process. The mass of ferric sulphide is wet with a solution of *soda ash* and exposed to the atmosphere. By a process of oxidation, the sulphur is largely released and the mass

becomes predominantly ferric oxide. As such it may again be used to draw sulphur from the raw gas manufactured as above stated. However, a single mass of iron oxide may not be successfully used more than two or three times even with the revivifying process and the refuse becomes of no further use or value in the plaintiff's business.

*Fatchemco, Ag-el 40, soda ash and lime, and disodium phosphate* are used and consumed in other processes by which the gas is purified and in treating the water used in this process. For example, soda ash and lime are used as water softeners. Disodium phosphate is used in boiler tubes in the process of generating steam.

The liability for the tax must be determined by an application of rule 63 of the rules and regulations published by the comptroller, which follows—

(1) The terms "retail sale," "sale at retail," "use," "storage," and "consumption" shall not include the sale, use, storage or consumption of industrial materials for future processing, manufacturing or conversion

into articles of tangible personal property for resale where such industrial materials become a component part of the finished product or are used directly and immediately dissipated in fabricating, converting, or processing such materials or parts thereof, nor shall such term include materials, containers, labels, sacks or bags intended to be used one time only for packaging tangible personal property for shipment or sale.

(2) Sandpaper, grinding wheels, saw blades, drills, files and tools of similar type, as well as detergents used for such purposes as removing grease and oil from parts, etc., are not considered to be immediately dissipated in fabricating and processing, and are taxable.

(3) Industrial chemicals and boiler compounds are taxable.

In reading and applying this rule, however, we must bear in mind that paragraph (1) is a direct quotation from the statute, section 212.02 (3b) F. S. A., while paragraphs (2) and (3) are the comptroller's construction of the statute. Should conflict appear, the statute must control over the comptroller's construction.

Since none of the substances in question actually go into and become a part of the gas which the plaintiff eventually sells, inquiry may be limited to ascertaining whether the substances are "industrial materials" which "are used directly and immediately dissipated in fabricating, converting, or processing" the gas manufactured and sold by plaintiff.

Beyond doubt the property is used directly in processing the gas. Is it "immediately dissipated" in that process?

As used here, "dissipated" cannot mean absolute destruction because absolute destruction of matter is chemically impossible.[2] As used in the statute, the word "dissipated" must be given a practical workable meaning which might be defined as loss of its capacity to function for the purpose and in the manner in which it is useful to the process in which it is used and is thereby reduced to negligible value in the hands of the manufacturer. By this definition both the brick and the chemicals are dissipated in the process described.

The next question is—Is this dissipation "immediate" within the meaning of the statute?

The word "immediate" has a variety of meanings. It may relate to causation; it may relate to place or space; and it may relate to time.[3] In determining the meaning to be ascribed to this word in construing the statute, the court should consider the overall plan and purpose of the statute and employ that meaning which conforms to the legislative policy evidenced by the statute as a whole.

It is quite apparent that the general policy of the statute is to tax the consumer, to exact the levy from the last transaction preceding the consumption of the article. But it is also apparent that consumption of raw materials in the process of manufacturing another article intended for sale is not to be taxed. The legislature apparently sought to avoid an indirect double taxation upon the consumer of manufactured products, which would follow if the sale of raw materials to a manufacturer were taxed and the sale of the finished product by the manufacturer were also taxed. Therefore, we find section 212.02 (3b) incorporated in the statute. This section discloses a legislative intent to exempt from taxation certain sales to manufacturers of articles for resale. The exemp-

---

[2]For all practical purposes, the court does not mean to dispute the modern theory that under some circumstances matter may be converted into energy.

[3]31 C. J. 245, et seq.

tion applies to "industrial materials [which] become a component part of the finished product." Applied to the case at bar, this would clearly exempt the crude oil out of which the gas is manufactured, and no effort to tax such oil is here involved.

But the legislature did not intend the exemption to be limited to those materials actually going into and becoming a part of the article intended for resale because the exemption is extended to those "industrial materials***[which]***are used directly and immediately dissipated in fabricating, converting, or processing" the raw materials into the finished product intended for resale. Of course this exemption does not extend to machinery or tools used in the manuacturing process. But it is clear that it is not necessary for any part of the material to be retained in the finished product in order for the exemption to apply.

It would seem that the only practical and reasonable construction to be placed upon the language used, when it is considered in the light of the legislative policy, is that the legislature intended to exempt from the tax the necessary materials purchased by the manufacturer and exhausted in the manufacturing process which do not constitute a part of the manufacturing plant or the tools of the trade. The use of the phrase "industrial materials" clearly excludes the latter from the exemption.

If we construe the words "immediately dissipated" as requiring an instantaneous destruction of the physical or chemical form of the material employed as a condition of the application of the exemption results would follow that would be entirely unreasonable and illogical. One manufacturer might be subject to the tax and another exempt based upon the speed of a chemical process or the suddenness of a physical change.

The comptroller has attempted to apply the statute and his rule and in so doing has declared that all of the items of property emphasized above are subject to the tax. In passing upon the action of the comptroller, the court is confronted with a strong presumption in favor of the administrative determination. This presumption is not conclusive but should be given substantial weight and should not be disregarded unless found to be clearly wrong.

. Applying this rule the court will not disturb the finding of the comptroller that the *carbofrax or checker brick* are a proper subject of taxation under the statute. They partake very much of the nature of a part of the machinery in the plaintiff's plant. They are themselves manufactured products. They are used in many thousands of operations before becoming unsuitable for further use. It is not the intent of the statute to exempt machinery no matter how

brief its life. Action of the comptroller in classifying these brick as not exempt under the statute is not clearly wrong and should be respected by the court.

As regards the other items mentioned, to-wit—iron oxide and shavings, Fatchemco, Ag-el 40, soda ash and lime, and disodium phosphate, the court is of the opinion that they meet every requirement of the statutory exemption from the tax.

These items are clearly within the phrase "industrial materials." They are used "directly" in the manufacturing process. They are "immediately dissipated" as that phrase has been defined above. They are readily distinguishable from detergents and other materials used in the cleaning and preservation of the machinery as distinguished from being used in the operation of the machinery in the production of the finished product of the plant. The court must find that the comptroller is in error in asserting that a tax should be paid with respect to the purchase or use of these items.

There is no conflict between the conclusion here announced and paragraph (2) of rule 63.

Paragraph (3) of rule 63, if literally construed, is clearly in conflict with the statute quoted in paragraph (1) of this rule. The phrase "industrial materials" clearly includes "industrial chemicals." In order to avoid inconsistency between the statute and paragraph (3) of the rule, the term "boiler compounds" is construed to mean substances used to cleanse boilers and remove deposits of scale or other foreign matter from boilers; and "industrial chemicals" is construed to mean chemicals used in industrial plants or machinery for similar purposes. In other words, "detergents", "industrial chemicals" and "boiler compounds" are construced to relate to substances which are used and exhausted in caring for, cleansing, and preserving the machinery and tools used in the manufacturing process. As such, they are taxable. These terms do not relate to the substances used and exhausted in producing, processing, cleansing and purifying the product of manufacture which becomes the subject of sale by the manufacturer.

It is therefore, considered, ordered, adjudged and decreed that the defendant Ray K. Green as Comptroller of the State of Florida be enjoined from attempting to force payment by the plaintiff of a sale or use tax with respect to the purchase by it, and use in the manufacture of gas, of the following items of tangible personal property—iron oxide and shavings, Fatchemco, Ag-el 40, soda ash and lime, and disodium phosphate.